REBECCA K. SMITH
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
Tel: (406) 531-8133
Fax: (406) 830-3085
publicdefense@gmail.com
Idaho State Bar #8346

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

# EASTERN DIVISION

| | |
|---|---|
| YELLOWSTONE TO UINTAS CONNECTION, and ALLIANCE FOR THE WILD ROCKIES,<br><br>                    Plaintiffs,<br>vs.<br><br>MEL BOLLING, Forest Supervisor Caribou-Targhee National Forest, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture.<br><br>                    Defendants. | Case No:   4:25-cv-211<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## I. INTRODUCTION

1.    This is a civil action for judicial review under the Administrative Procedure Act of the U.S. Forest Service's March 21, 2025 Special Use Permit, December 4, 2024 Record of Decision (2024 ROD), November 1, 2019 Record of Decision (2019 ROD), Environmental Impact Statement (EIS), and Supplemental Environmental Impact Statement (SEIS) authorizing the Crow Creek Pipeline Project ("Project") on the Caribou-Targhee National Forest in Idaho, and authorizing a number of amendments to the 2003 Revised Forest Plan.

2.    Plaintiffs Yellowstone to Uintas Connection and Alliance for the Wild Rockies attest that the final decision approving the Project and amendments is arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3.    Defendants' actions or omissions violate the National Environmental Policy Act (NEPA), 42 U.S.C.  §§ 4331 et seq., the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 et seq., Mineral Leasing Act, 30 U.S.C. §§ 185 et seq, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq.

4.    Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and such other relief as this Court deems just and proper.

## II. JURISDICTION

5.    This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.  *See also* 16 U.S.C. § 1540(g). Additionally, the Project is exempt from the Natural Gas Act and therefore the jurisdictional provision of the Natural Gas Act found at 15 U.S.C. § 717r (b) does not

apply to this case. *Yellowstone to Uintas Connection v. Bolling*, 524 F. Supp. 3d 1081, 1089 (D. Idaho 2021).

6.     An actual controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy the Caribou-Targhee National Forest for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

7.     The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members and staff have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under the MLA, NFMA, NEPA, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 & 2202, 5 U.S.C. §§ 705 & 706,.

8.     Plaintiffs submitted administrative comments and objections for the Project. Therefore, Plaintiffs exhausted available administrative remedies for their APA claims. Defendant's Record of Decision was the final administrative action of the U.S. Department of Agriculture Forest Service. Thus, the Court has jurisdiction to review Plaintiffs' APA claims.

### III.  VENUE

9.     Venue in this case is proper under 28 U.S.C. § 1391(e) and Local Civil Rule 3.1. The Project is located in Bear Lake and Caribou Counties, so venue is proper in the Eastern Division of the District of Idaho.

## IV. PARTIES

10.  Plaintiff YELLOWSTONE TO UINTAS CONNECTION (Y2U) is a non-profit public interest organization dedicated to protecting the integrity of habitat for native fish and wildlife in the wildlife corridor that connects the Greater Yellowstone Ecosystem and Northern Rockies to the Uinta Wilderness and Southern Rockies. Members of Y2U work to restore fish and wildlife habitat in the Yellowstone to Uintas Corridor through the application of science, education and advocacy. Y2U's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems by approving the challenged Project. Y2U brings this action on its own behalf and on behalf of its adversely affected members.

11.  Plaintiff ALLIANCE FOR THE WILD ROCKIES (Alliance) is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Rocky Mountains, its native plant, fish, and animal life, and its naturally functioning ecosystems. Members of the Alliance observe, enjoy, and appreciate native wildlife, water quality, and terrestrial habitat quality. Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems by approving the challenged Project. Alliance brings this action on its own behalf and on behalf of its adversely affected members.

12.  Defendant MEL BOLLING is the Forest Supervisor for the Caribou-Targhee National Forest. In that capacity, he is the official responsible for issuing the Record of Decision that authorized the Crow Creek Pipeline Project, and he is responsible for ensuring that the Project is in compliance with federal environmental laws.

13.  Defendant UNITED STATES FOREST SERVICE (Forest Service) is an administrative

3

agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the Caribou-Targhee National Forest.

## V.  FACTUAL ALLEGATIONS

A.     PROCEDURAL BACKGROUND

14.     On November 1, 2019, Defendant Bolling signed a Record of Decision authorizing the Crow Creek Pipeline Project (Project) on the Caribou-Targhee National Forest (Forest).

15.     On April 20, 2020, Plaintiffs filed a Complaint challenging the 2019 ROD: *Yellowstone to Uintas Connection v Bolling, et al.*, .Case No. 4:20-cv-00192-DCN (D. Idaho).

16.     On July 20, 2020, Defendants filed a motion to dismiss. Case No. 4:20-cv-00192-DCN Dkt 23.

17.     On September 11, 2020, Plaintiffs filed an Amended Complaint. Case No. 4:20-cv-00192-DCN Dkt 27.

18.     On October 16, 2020, Defendants filed a motion to dismiss. Case No. 4:20-cv-00192-DCN Dkt 36.

19.     On February 5, 2021, this Court held a hearing on Defendants' motions to dismiss. Case No. 4:20-cv-00192-DCN Dkt 46.

20.     On March 8, 2021, this Court denied Defendants' first motion to dismiss as moot, and denied Defendants' second motion to dismiss on the merits. Case No. 4:20-cv-00192-DCN Dkt 47.

21.     On April 5, 2021, Defendants filed an Answer to Plaintiffs' Amended Complaint. Case No. 4:20-cv-00192-DCN Dkt 54.

22.     On June 15, 2021, Plaintiffs filed a motion to supplement and/or complete the administrative record, and/or take judicial notice. Case No. 4:20-cv-00192-DCN Dkt 62.

23.     On December 1, 2021, the Court granted in part and denied in part Plaintiffs' motion. Case

No. 4:20-cv-00192-DCN Dkt 65.

24. On December 14, 2021, the Court approved a summary judgment briefing schedule. Case No. 4:20-cv-00192-DCN Dkt 67.

25. On March 7, 2022, Plaintiffs filed their summary judgment motion and brief in support. Case No. 4:20-cv-00192-DCN Dkt 86.

26. On March 28, 2022, the Forest Service formally withdrew the Record of Decision authorizing the Crow Creek Pipeline Project.

27. On August 5, 2022, the Parties filed a stipulation of dismissal.  Case No. 4:20-cv-00192-DCN Dkt 105.

28. On August 9, 2022, the Court dismissed the case.    Case No. 4:20-cv-00192-DCN Dkt Dkt 106.

29. The Forest Service issued a draft supplemental EIS for the Project on July 14, 2023.

30. The Forest Service issued a final supplemental EIS for the Project on July 19, 2024.

31. The Forest Service issued a ROD re-authorizing the Project on December 4, 2024.

32. The Forest Service issued a special use permit for the Project on March 21, 2025.

33. The EIS states that no ground-disturbing activities will occur between April 1 and June 15 within 6.2 miles of a sage grouse lek.

34. Almost the entire Project is within 6.2 miles of a sage grouse lek.

35. The April 1, 2025 Schedule of Proposed Action (SOPA) for the Forest states that Project implementation will start in July 2025.

36. The EIS states that Project implementation will take anywhere from nine months to 24 months.

B.    PROJECT

37. The EIS states in summary: "The U.S. Forest Service (USFS), Caribou-Targhee National

Forest proposes to create a utility corridor and issue a special use permit for the construction, operation, and maintenance of a new 12-inch or less diameter, high-pressure pipeline to provide natural gas to the Afton/Star Valley, Wyoming area.  In several locations in the Project Area, the Project would follow an existing road . . . . In other locations . . . the Project deviat[es] from the road corridor. The total pipeline length would be approximately 48 miles, with approximately 20 miles crossing USFS-managed federal land."

38.  The Project authorizes a 50-foot right-of-way during construction, and a permanent 20-foot right-of-way thereafter to maintain the pipeline.

39.  In addition to the pipeline itself and the utility corridor, there will also be above-ground facilities such as valves and staging areas.

40.  The pipeline utility corridor will permanently cut through five different Inventoried Roadless Areas on National Forest lands: Gannett, Hell Hole, Meade Peak, Red Mountain, and Telephone Draw.

41.  The corridor will cut through habitat for species listed under the Endangered Species Act, habitat for a precipitously declining population of sage grouse, and habitat designated as critical elk and deer winter range.

42.  The only change to the Project from the supplemental EIS was the rerouting of 0.5 miles of the project off of federal Bureau of Land Managemennt (BLM) lands, and onto private lands.

43.  Only 50% of the proposed pipeline corridor is adjacent to existing roads.

44.  Approximately 60% of the Project uses existing right-of-ways.

45.  The rest of the corridor will be accessed by driving vehicles off-road: "Access in areas not

accessible by existing roads would be cross-country travel and drive and crush, except in areas where larger shrub vegetation would require mowing."

46. Vegetation will be removed within the 50-foot wide right-of-way construction corridor.

47. In forested areas, trees would be removed using heavy equipment and skidded to log landings. In other areas, shrubs would be masticated and grass would be mowed.

48. Prior to reclamation, the right-of-way will likely be similar to a gravel road.

49. The Forest Service anticipates that a trackhoe and dump trucks will be able to access the entire 18.2 mile corridor through National Forest lands during construction.

50. The 18.2 mile-long clearcut corridor will cause permanent vegetation removal, increased sight-lines for poaching, increased weed spread, and abundant new opportunities for illegal off-road motor vehicle use indefinitely in these areas.

51. There are no benefits to public lands or wildlife from this Project.

52. The purported need for this pipeline is that the private company will be able to provide more reliable service and lower costs to customers if it uses a pipeline to transport natural gas from Montpelier, Idaho to Afton, Wyoming, rather than using surface transportation.

53. The EIS implies that the private company is the only supplier of heating fuel to Afton, Wyoming, but in reality propane is also available to customers in Afton, Wyoming. The Forest Service states: "As stated in the EIS, the project is not anticipated to increase the number of LVE customers burning natural gas, with the exception that *the current customers who are burning either wood and/or propane would likely switch to burning natural gas . . . .*"

54. The Project is so inconsistent with the governing Forest Plan that the Forest Service had to authorize amendments to eliminate six different existing Forest Plan prescriptions for

the Project area in order to allow the Project:

1. Prescription 2.1.2 (b) – Visual Quality Maintenance;

2. Prescription 2.7.1 (d) – Elk and Deer Winter Range, Critical;

3. Prescription 2.7.2 (d) – Elk and Deer Winter Range;

4. Prescription 2.8.3 – Aquatic Influence Zones;

5. Prescription 3.1 (e) – Nonmotorized Recreation and Wildlife Security; and

6. Prescription 6.2 (b) – Rangeland Vegetation Management

55. The Forest Service replaced these six prescriptions with Prescription 8.1(b) – Concentrated Development Areas.

56. This is a permanent programmatic change, which will allow future utility lines to be placed in this corridor.

57. The terms of the permit allow the pipeline to be in place for at least 30 years, with an option to renew.

C.    SAGE GROUSE & SAGEBRUSH HABITAT

58. Sage grouse populations are declining across much of their range; they are extirpated in seven states where they previously were found.

59. Habitat loss, habitat fragmentation, habitat degradation, weather, predation, and hunting have all contributed to the decline.

60. The population of sage grouse in Idaho, in particular, is declining: the male population in 2014 was 4,916 and in 2019 was 3,018.

61. In 2019, the government found that out of its eight "Conservation Areas," Idaho had reached "hard triggers" from population loss in five Conservation Areas and a "soft trigger" related to population loss in one Conservation Area.

62. In the "Southern Conservation Area - Important," which covers the portion of Southern Idaho that includes this proposed pipeline, the sage grouse population has reached a "hard trigger" due to a population decline of 25% in this particular area since 2011.

63. Sage grouse increasingly depend on habitat provided on the Forest and other public land due to a decline in habitat on private land as a result of agriculture and development.

64. The Forest Service predicts that sagebrush habitat within ten miles of leks will provide summer nesting and brood-rearing and winter habitat for sage grouse.

65. The entire proposed pipeline right-of-way corridor is within ten miles of a lek.

66. The Forest Service acknowledges that sagebrush habitat within 20 kilometers of active leks may provide nesting, brood-rearing, and winter habitat for sage grouse.

67. Sage grouse may use the sagebrush habitats found in the Project Area, including for nesting and as brood habitat.

68. All five affected Inventoried Roadless Areas are classified as "rated high for potential sage grouse habitat" by the Forest Plan ROD.

69. The pipeline right-of-way corridor would remove approximately 212 acres of sagebrush habitat.

D.   2019 PROPOSED FOREST PLAN AMENDMENT FOR SAGE GROUSE

70. The Forest Service issued a draft Record of Decision for a new Forest Plan amendment for sage grouse habitat on August 2, 2019, which began a 60-day administrative objection process.  84 Fed. Reg. 37233 (July 31, 2019).

71. The 2019 Forest Plan amendments for sage grouse have never been finalized and adopted.

72. Therefore, currently, the Forest Service is still operating under the 2015 Forest Plan amendment for sage grouse.

E.    2015 FOREST PLAN AMENDMENT FOR SAGE GROUSE

73.    The Project EIS states: "Currently, Sage Grouse habitat is managed per the most recent

       guidance in the 2003 Revised Forest Plan and, where applicable, in accordance with the

       2015 Land Management Plan Amendments."

74.    The 2015 Forest Plan amendment for sage grouse ROD states: "This decision supercedes

       direction in existing LMPs related to GRSG or its habitat, unless existing direction provide

       equal or greater protection for GRSG or its habitat."

75.    The 2015 Forest Plan amendment for sage grouse sets triggers for the management of

       sage grouse habitat.

76.    Under, the 2015 Forest Plan amendment for sage grouse, a "hard trigger" is a "threshold

       indicating that immediate action is necessary to stop a severe deviation from greater sage-

       grouse conservation objectives set forth in the land and RMP."

77.    The 2015 Forest Plan amendment for sage grouse, Standard GRSG-AM-ST-010

       mandates: "If a hard trigger is identified, [1] management direction applying to priority

       habitat management areas [PHMA] will be applied to important habitat management areas

       [IMHA] within the Conservation Area is Idaho, and [2] the Sage-Grouse Implementation

       Task Force will evaluate available and pertinent data and recommend additional potential

       implementation level activities to the appropriate Forest Service line officer in both Idaho

       and Southwest Montana (Appendix C)."

78.    The 2015 Forest Plan amendment for sage grouse mandates: "The hard and soft trigger

       data will be analyzed as soon as they become available after the signing of the ROD and

       then at a minimum, analyzed annually thereafter."

79.    A hard population trigger in Idaho is a 20% decline in the number of male sage grouse.

80.    The Project is located in the Important Southern Idaho Conservation Area.

81.    In 2019, the hard trigger was reached in this Conservation Area.

82.    Standard GRSG-GEN-ST-004 requires: "In priority habitat management areas and sagebrush focal areas, do not issue new discretionary written authorizations unless all existing discrete anthropogenic disturbances cover less than 3% of the total greater sage-grouse habitat within the Biologically Significant Unit and the proposed project area, regardless of ownership, and the new use will not cause exceedance of the 3% cap."

83.    Part of the purpose of Standard GRSG-GEN-ST-004 is to "concentrate future ROW [right-of-way] surface disturbance in areas of existing disturbance and avoid new development of infrastructure corridors in PHMAs consistent with guidance from the COT report."

84.    Neither the EIS nor SEIS discloses or applies Standard GRSG-GEN-ST-004.

85.    The record indicates that existing disturbances in the cumulative effects analysis area for the Project cover 30,034 acres, which is 10.1% of the 297,495 acre cumulative effects analysis area.

86.    The Project will result in additional direct or indirect disturance effects to 2,998.5 acres of key sagebrush habitat.

87.    Thus, existing disturbance of 10.1% will increase to disturbance of 11.1% from the Project.

88.    Other Forest Plan requirements from the 2015 Forest Plan amendment include Standards GRSG-GEN-ST-005, GRSG-GEN-ST-006, GRSG-LR-SUA-ST-013, GRSG-LR-SUA-ST-015, GRSG-LR-SUA-ST-016.

89.    The 2015 Forest Plan amendment for sage grouse mandates: "The Forest Service will

assess and address impacts from activities using the lek buffer-distances as identified in the

USGS Report Conservation Buffer Distance Estimates for GRSG – A Review (Open File

Report 2014 - 1239) [].  The lek buffer-distances specified as the lower end of the

interpreted range will be applied in the report . . . .The Forest Service will use the most

recent active or occupied lek data available from the applicable State wildlife agency to

determine lek locations.  The lek buffers are incorporated as guidelines in the LMP

amendments."

90.     More specifically, GRSG-GEN-DC-003 requires the application of specific habitat

protections within 6.2 miles from active leks, including minimal requirements for

sagebrush canopy cover, sagebrush height, and water quality.

91.     The map below indicates that there is only one short section of the pipeline that is not

within 6 miles of a lek:

//


//




//





//



Only section of pipeline not within 6 miles of a lek

Legend

Proposed Action
Alternative 1
Alternative 2
Greater Sage-grouse Observation Location
Greater Sage-grouse Lek
▲ Occupied
▲ Unoccupied
▲ Undetermined Status

Greater Sage-grouse Development Habitat [WY]
Greater Sage-grouse Core Habitat [WY]
Greater Sage-grouse Current Range 2015 [WY]

Idaho and Southwestern Montana Sub Regional Sage-grouse Data
General Habitat Management Area
Important Habitat Management Area

**Figure 3.10-1**
**Greater Sage-grouse Habitat**
**Lower Valley Energy**
**Crow Creek Pipeline Project**

F.      2003 REVISED FOREST PLAN - SAGE GROUSE

92.     Management Indicator Species Standard 1, RFP 3-25, requires: "In project analyses affecting the habitats listed below, assess impacts to habitat and populations for the following management indicator species . . . Sagebrush habitats – Sage Grouse."

93.     The ROD for the 2003 Revised Forest Plan explains: "A decline of 10 percent or more in the number of male grouse would initiate a further analysis in cooperation with IDFG."

94.     In 2019, the population of male grouse dropped by over 20%, as noted above.

95.     The ROD for the 2003 Revised Forest Plan explains: "While leks (where populations are most easily monitored) are not on Forest, changes in populations could reflect changes in habitat conditions on the Forest."

96.     Sage Grouse Guideline 1, RFP 3-32, requires: "Current guidelines for sage ... grouse management, such as Connelly et al. (2000), should be used as a basis to develop site-specific recommendations for proposed sagebrush treatments."

97.     The ROD for the 2003 Revised Forest Plan explains: "Habitat management guidelines have recently been updated (Connelly et al, 2000). These guidelines (nesting, brood-rearing and winter habitat) would be incorporated at the site-specific level where appropriate."

98.     Sage Grouse Guideline 2, RFP 3-32, requires: "Management activities should consider proximity to active lek locations during site-specific project planning. Those within 10 miles of an active sage grouse lek . . . should be considered further for suitability as grouse habitat."

99.     Monitoring for sage grouse, RFP 5-15, must "[m]onitor changes in habitat conditions from vegetation treatments within 10 miles of leks."

100.    The entire proposed pipeline corridor is within 10 miles of a lek, as demonstrated by the

map below:



G.    LACK OF SAGE GROUSE ANALYSIS IN PROJECT EIS & SEIS

101.   The requirements of the 2015 Forest Plan amendment for sage grouse were not fully disclosed to the public or analyzed in the Project EIS or SEIS

102.   The Project EIS does not disclose all management direction for Priority Habitat Management Areas and apply it to the Important Habitat Management Areas as required once the hard trigger is reached.

103.   In particular, Standard GRSG-GEN-ST-004 – which prohibits "new discretionary written authorizations unless all existing discrete anthropogenic disturbances cover less than 3% of the total greater sage-grouse habitat within the Biologically Significant Unit and the proposed project area, regardless of ownership, and the new use will not cause exceedance of the 3% cap" – is not disclosed or analyzed in the Project EIS or SEIS and therefore it is not possible to determine whether the Forest Service is complying with it.

104.   Additionally, the Project EIS/SEIS does not disclose whether the Sage-Grouse Implementation Task Force has evaluated available and pertinent data and recommended additional potential implementation level activities to the appropriate Forest Service line officer, which is also required once a hard trigger is reached.

105.   Other Forest Plan requirements from the 2015 Forest Plan amendment that were not fully addressed in the Project EIS include Standards GRSG-GEN-ST-005, GRSG-GEN-ST-006, GRSG-LR-SUA-ST-013, GRSG-LR-SUA-ST-015, GRSG-LR-SUA-ST-016,

106.   The Project EIS/SEIS does not disclose GRSG-GEN-DC-003 habitat parameters or conduct an analysis of these habitat parameters within 6.2 miles of active leks.

107.   The requirements of the 2003 Revised Forest Plan for sage grouse were also not fully disclosed to the public and analyzed in the Project EIS/SEIS.

108.    Although the sage grouse is a management indicator species for the 2003 Revised Forest
        Plan, which means that changes in population levels are measured and analyzed to indicate
        whether habitat is being appropriately managed, there is no meaningful discussion in the
        Project EIS of (1) the fact that sage grouse in this Conservation Area have declined by
        25%, (2) whether that decline is related to changing habitat conditions on the Forest, and
        (3) whether the Forest Service initiated and conducted an analysis of this issue with IDFG,
        as mandated for any population decline greater than 10%, prior to signing the Project
        Decision.

109.    Although the Project allows removal of sagebrush habitat and other disruptive activities,
        and although the entire proposed pipeline corridor is within 10 miles of a lek, the Project
        EIS does not contain disclosure and analysis of habitat conditions within 10 miles of leks
        or analyze compliance with Connelly Guidelines for sage grouse habitat, as required by the
        2003 Revised Forest Plan.

H.    ANALYSIS OF ALTERNATIVES

110.    In the EIS, the Forest Service analyzed a "no action" alternative and three alternatives that
        largely follow the same route through National Forest lands with only a slight deviation.

111.    The Forest Service refused to analyze an alternative route that would follow the existing
        Highway 89 corridor.

112.    The Forest Service refused to analyze an alternative that followed existing right-of-way
        corridors, such as the Simplot slurry pipeline.

113.    The Forest Service refused to analyze an alternative in which the company simply stores
        more gas in its facility and continues with surface transportation.

114.    The Project EIS indicates that the storage alternative is "feasible."

115.    The U.S. Environmental Protection Agency (EPA) raised multiple red flags regarding the

Forest Service's failure to analyze a reasonable range of alternatives:

> The three action alternatives proposed generally follow the same alignment, with Alternatives 1 and 2 providing minor deviations from the Proposed Action Alternative. None of the action alternatives substantially reduce impacts to Inventoried Roadless Areas, aquatic resources, habitats or species."
>
> ...
>
> further analysis of these routes appears warranted to reduce development impacts in Inventoried Roadless Areas, as well as impacts to aquatic and terrestrial resources and habitats. Specifically, we suggest further study of:
>
> • The Highway 89 route alignment on private and other lands, outside the Wyoming DOT right-of-way, where there may be potential to avoid and minimize many of the aquatic resource impacts;
>
> • The Georgetown-Wells Canyon Route, which is substantially shorter (37 miles), to determine whether further alignment adjustments could be made to avoid construction and ROW limitations. This route would enable beneficial re-use of a mine reclamation site, and reduce new disturbance needed for the pipeline corridor; and
>
> • A route that could potentially co-locate with the Simplot slurry pipeline, which could also serve to minimize new ROW development within the IRAs.

116.  The EPA also commented: "Per our February 2018 scoping comments, we recommend that an alternative be included that would be fully located within an existing roadway or other infrastructure right-of-way. We note that US 89, which provides a direct route between Montpelier, ID and Afton, WY, could serve as such an alternative, and would avoid impacts to all inventoried roadless areas. A US 89 alignment could avoid the stated impacts to the roadless characteristics of soil, water, air resources, diversity of plant and animal communities, habitat for special status species and species dependent on large undisturbed areas of land, primitive and semi-primitive classes of recreation, landscape character and integrity, and other locally unique characteristics that may result from the current proposed alternatives []. The EPA finds that the rarity and diminishing supply of

roadless areas warrants the inclusion of alternatives that can avoid impacts to remaining IRAs."

117.    The EPA also commented: "We note that there are direct, indirect, and cumulative losses of native vegetation, particularly the long term/permanent loss of trees in the ROW.  There are also projected high acreage and percent losses of Mountain Big Sagebrush habitat, which is critical to sustain the greater sage grouse.  These losses would be exacerbated by the long term/permanent introduction of noxious weeds and invasive plants due to vegetation removal, disturbance, and vehicular traffic in the project area.  We recommend that it is important for the EIS to acknowledge that a number of native vegetation species and habitats have become imperiled as a result of cumulative impacts from projects over time.  Therefore, we recommend that the EIS include supporting analysis for the current conclusion that the impacts to native vegetation would be negligible.  The EPA finds that the opportunity to avoid additional cumulative impacts to depleted habitat and roadless areas could be addressed with the analysis of an alternative pipeline route that follows existing roadway corridor.  Please see our earlier recommendations about the range of alternatives."

118.    In scoping comments, the Idaho Departments of Lands, Agriculture, Fish and Game, Parks and Recreation, Environmental Quality and the Idaho Governor's Office of Species Conservation requested: "Expand analysis to alternatives that do not require forest plan amendment, including pipeline routes that would avoid roadless areas and routes that would not require new utility corridors."

119.    In the Project EIS, the Forest Service includes two conclusory pages that list other alternatives that would not be analyzed.  The Forest Service represents:  "In addition to the proposed pipeline alignment (Proposed Action) and the No Action Alternative, LVE

19

[the natural gas company] considered six other routes during the pre-engineering process: (1) Alternative 1: deviations from the Proposed Action, (2) Alternative 2: deviations from the Proposed Action, (3) the Georgetown-Wells Canyon route, (4) the Georgetown-Left Fork route, (5) the Soda Springs/Simplot Slurry Line route, and (6) the US 89 Route. Routes 3, 4, 5, and 6 were eliminated from detailed analysis. A detailed comparison of potential resource concerns and associated impacts can be found in the Environmental Constraints Analysis for Lower Valley Energy's Natural Gas Pipeline Alternatives (Stantec 2017a)."

120.    No information is provided as to how the public can access the purported alternatives analysis documented in "Environmental Constraints Analysis for Lower Valley Energy's Natural Gas Pipeline Alternatives (Stantec 2017a)."

121.    In draft EIS comments, the U.S. Army Corp of Engineers raised this as a red flag: "Documents referenced in the DEIS that are integral to any final decision such as 'Environmental Constraints Analysis for Lower Valley NG Pipeline prepared by Stantec in January 2017' (Page 5 DEIS) should be placed on the public website." In the final EIS, the Forest Service does not acknowledge or respond to this comment.

122.    Despite the express request and reminder by the U.S. Army Corps of Engineers, the document "Environmental Constraints Analysis for Lower Valley NG Pipeline" was not made publicly available on the Forest Service's public website.

123.    Plaintiffs filed a Freedom of Information Act (FOIA) request for the Forest Service's project file for the Project, and received the project file. The project file does not include the document "Environmental Constraints Analysis for Lower Valley NG Pipeline" prepared by Stantec in January 2017.

I.    ILLEGAL MOTORIZED USE OF PIPELINE CORRIDOR

124.    Motorized route closures are limited in effectiveness:  The USU Institute for Outdoor Recreation and Tourism has conducted studies showing that nearly 40% of riders admit driving off legal trails on their last ride.

125.    The Forest Service published a Technical Report in 2005 (RWU – 2905) that also recognized there is a lack of evidence that educational programs lead to behavioral changes in motorized users.

126.    Currently, there is no Forest Service enforcement of either summer or winter travel by OHVs within the Caribou National Forest.

127.    The Project EIS concedes: "This area would be susceptible to unauthorized OHV use as well as opening other areas to unauthorized use."

128.    The Project EIS concedes: "OHV use is likely to be the most damaging to the existing characteristics of the area. Unauthorized OHV use caused by the perceived creation of access points due to construction of the project is a primary concern."

129.    The Project EIS concedes: "OHV riding, including ATV and motorcycle use, is a popular activity and motorized trails and roads within the study area that are open to ATVs and are heavily used. Fall use increases with the presence of hunters using ATVs and OHVs to scout game."

130.    The Project EIS concedes: "Where the pipeline would leave existing road corridors, there is the potential for the cleared areas to be used by OHVs. If OHVs travel along the pipeline route in these areas, they may also split off into otherwise unroaded areas, creating new, unauthorized trails."

131.    Regarding this problem, the EPA commented: "Disturbance resulting from unauthorized vehicle use poses an open-ended source of impacts, which could affect other resources . . .

. Unless the potential for Off Highway Vehicle use is prevented, it is reasonable to expect that long-term impacts from unauthorized OHV use would result from pipeline construction to all potentially affected resources. The NEPA analysis should acknowledge and analyze these impacts based on the documented studies, data, and analyses available regarding the potential for unauthorized OHV use, effectiveness of proposed preventative measures, the effects of OHV use on the Caribou-Targhee National Forest and other public lands."

132.    Regarding this issue, one local resident commented: "The pipeline will de facto put roads through Inventoried Road Areas. The 20' easement will appear as a road that will be used for ORV travel with or without signs or barricades. There is no provision for enforcement and the Forest Service has not had the will or resources to enforce restrictions. This will additionally stress wildlife and will not abate after construction is complete."

133.    In response to this public comment, the Forest Service stated: "protection measures are in place to prevent use as a road. If these measures are determined to be insufficient, the USFS could require additional measures be implemented by [the natural gas company]. However, it is not appropriate in this EIS to analyze the USFS's enforcement capabilities or priorities."

134.    Similarly, Y2U commented: "Currently there is no enforcement of either summer or winter travel by ohvs within the CTNF and the CTNF has not identified the extent of illegal or unauthorized trails. Y2U is well aware of this fact as we work with the CTNF to close illegal trails and dispersed campsites. There is no budget for closing these or for that matter, mapping them. How will Forest Service ensure that this new route will not become another illegal trail?"

135.    In response, the Forest Service stated: "As the EIS states, to prevent unauthorized public

access at the end of construction, signs and physical barriers (gates, boulders, etc.) would

be used at likely entry points. It is the intent that no unauthorized access would be

allowed. Any evidence of unauthorized use would be detected at a minimum during

regular inspection of the pipeline and fixed."

136.    The Forest Service also stated: "[The natural gas company] would need to ensure that

unauthorized access to the ROW is successful [sic] over the long-term and monitor the

effectiveness of blocking off access points, as improvements could be needed if

unauthorized access occurs."

137.    Thus, the Forest Service has no intention to change its current practice and expend its own

resources to enforce a motorized vehicle closure of the pipeline corridor, but instead will

leave that to the natural gas company to be conducted once a year during the required

annual safety inspection.

## VI.  CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

*The Forest Service's failure to disclose and demonstrate compliance with the Forest Plan requirements for sage grouse from the 2003 Revised Forest Plan and 2015 Forest Plan amendment, in the Project EIS or SEIS, violates NFMA, NEPA, and the APA.*

138.    All above paragraphs are incorporated by reference.

139.    NFMA requires that each National Forest must develop a "Land and Resource

Management Plan," i.e. a forest plan. 16 U.S.C. §1604(d).

140.    A forest plan is implemented through site-specific actions.  *Neighbors of Cuddy Mountain

v. USFS*, 137 F.3d 1372, 1376 (9th Cir. 1998).

141.    The "Forest Service's failure to comply with the provisions of a Forest Plan is a violation

of NFMA."  *Native Ecosystems Council v. USFS*, 418 F.3d 953, 961 (9th Cir. 2005).

142.    The Forest Service's failure to demonstrate compliance with its Forest Plan also violates

NEPA's "hard look" requirement. *Id* at 965.

143.    In *Neighbors*, the Ninth Circuit addressed the forest plan for the Payette National Forest and found that the Forest Service's failure to analyze whether individual pileated woodpecker home ranges had the habitat required by the forest plan constituted a violation of the forest plan and NFMA.  137 F.3d at 1376. The court noted that "each range is approximately 10 miles in diameter" and held that "the Forest Service provides no information whatsoever regarding how many woodpecker home ranges there are within the sale area, or how many home ranges would be affected by the timber sale. [] Having failed to do so, it certainly could not have demonstrated that after the sale, a sufficient percentage of old growth would remain in each affected pileated woodpecker home range." *Id* at 1377-1378.  The court thus held: "the Forest Service did not comply with the requirements of the LRMP in so far as the Forest Service evaluated the 'analysis area' rather than the 'home range' of the pileated woodpecker.  As such, it did not demonstrate that the Grade/Dukes project would be consistent with the Payette LRMP, and thus it failed to comply with NFMA." *Id* at 1378.

144.    As set forth above in detail, there are numerous provisions related to sage grouse and management of sage grouse habitat in the 2003 Revised Forest Plan and 2015 Forest Plan amendment for sage grouse that must be addressed at the project level.  The Forest Service did not demonstrate compliance with them in the Project EIS or SEIS.

145.    The Forest Service's failure to demonstrate compliance with the provisions of its own Forest Plan in the Project EIS or SEIS violates NFMA, NEPA, and the APA.

## SECOND CLAIM FOR RELIEF

*The Forest Service's failure to take a hard look at potential cumulative effects on sage grouse and sagebrush habitat violates NEPA and the APA.*

146.   All above paragraphs are incorporated by reference.

147.   Cumulative impacts "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. §1508.7.

148.   "To 'consider' cumulative effects, some quantified or detailed information is required. Without such information, neither the courts nor the public, in reviewing the Forest Service's decisions, can be assured that the Forest Service provided the hard look that it is required to provide."  *Neighbors*, 137 F.3d at 1379.

149.   It is not appropriate "to defer consideration of cumulative impacts to a future date. NEPA requires consideration of the potential impact of an action *before* the action takes place." (Citation and internal quotation marks omitted). *Id.*

150.   In *Neighbors*, the Ninth Circuit held: "Other than [general] statements, however, the Forest Service has provided no detail regarding the extent to which the proposed sales would cumulatively impact and reduce old growth habitat.  Significantly, the Forest Service has failed to even mention the number or percentage of trees meeting the definition of old growth that would be destroyed by the three other proposed timber sales in the Cuddy Mountain Roadless area, and whether the sales would affect the same pileated woodpecker home ranges that would be affected by the Grade/Dukes sale." *Id* at 1379.

151.    In this case, the Forest Service has committed a similar violation of law.  As noted above, the entire proposed pipeline corridor is within 10 or 12 miles of a sage grouse lek, which is the distance required for a meaningful analysis of impacts to sage grouse according to the best available science and the agency's own planning documents. Additionally, the proposed pipeline corridor will cut through five Inventoried Roadless Areas, all of which have been designated as "rated high for potential sage grouse habitat" by the Forest Plan ROD.   Nonetheless, the Project EIS does not disclose (1) the existing habitat conditions of the 10 or 12-mile diameter sage grouse home ranges that overlap the proposed pipeline corridor, (2) whether these 10 or 12-mile diameter sage grouse home ranges comply with the Connelly guidelines, as required by the Forest Plan, and (3) the impact of past, present, and reasonably foreseeable activities, including but not limited to other projects as well as unauthorized off-road vehicle use, on these 10 or12-mile diameter sage grouse home ranges.

152.    Instead of taking a hard look at cumulative effects in a meaningful way that comports with the best available science, the EIS and SEIS provide cursory and conclusory paragraphs that lack meaningful detail and ignore the best available science.

153.    In light of the recent 25% decline in Idaho's sage grouse population, and the fact that the Forest Service is obligated to analyze the connection between habitat degradation on National Forest lands and declining populations, the agency's failure to take a hard look at cumulative effects on sage grouse is especially egregious in this case.

154.    The Forest Service's failure to take a hard look at cumulative effects on sage grouse and sagebrush habitat violate NEPA and the APA.

### THIRD CLAIM FOR RELIEF

*The Forest Service's failure to demonstrate (1) that the new pipeline corridor is in the public interest, (2) that the new pipeline corridor is compatible and consistent with other Forest resources, (3) that there is no reasonable alternative or accommodation off National Forest land, (4) that the use of existing right-of-ways is "impractical," and (5) that the rationale for locating the new pipeline corridor on National Forest lands is not solely lower cost or less restrictive location violates the Forest Plan, Forest Service regulations, the Forest Service Manual, NEPA, NFMA, the Mineral Leasing Act, and APA.*

155.    All above paragraphs are incorporated by reference.

156.    The Forest Plan at RFP 3-9 – 3-10 includes a goal that states: "Uses and occupancy of National Forest System lands, such as . . . utility corridors that meet public needs, and cannot be accommodated off the National Forest, are consistent with direction for other National Forest resources."

157.    The Forest Plan at RFP 3-10 includes a goal that states: "Special use authorizations are issued only for uses that serve the public, promote public health and safety, protect the environment, and those uses that are legally mandated."

158.    The Forest Plan at RFP 3-10 includes a standard that mandates: "Allow special uses that are compatible with other resources."

159.    The Forest Plan at RFP 3-11 includes a standard that mandates: "Proponents of . . . new corridor routes, shall demonstrate that the proposal is in the public interest, and that no other reasonable alternative exists to public land routing."

160.    The Forest Plan at RFP 3-11 – 3-12 includes the following guidelines: (4) Where feasible, new facilities should be limited to existing rights-of-way having widening potential; (6) Avoid parallel corridors.  Consolidate facilities within existing corridors where feasible; (7) Pipelines and other related utilities should share utility corridors except as needed to meet other resource goals.

161.    Similar to these RFP Guidelines, the Mineral Leasing Act includes a mandate:  "In order

27

to minimize adverse environmental impacts and the proliferation of separate rights-of-way across Federal lands, *the utilization of rights-of-way in common shall be required to the extent practical*, and each right-of-way or permit shall reserve to the Secretary or agency head the right to grant additional rights-of-way or permits for compatible uses on or adjacent to rights-of-way or permit area granted pursuant to this section."  30 U.S.C. § 185 (emphasis added).  An agency's failure to make an express finding that the use of existing right-of-ways is "impractical" requires vacatur of the decision.  *Sierra Club, Inc. v. United States Forest Serv.*, 897 F.3d 582, 605–06 (4th Cir. 2018).

162.  Furthermore, the Forest Service regulations mandate that the Forest Service "shall reject any proposal" if "(i) [t]he proposed use would be inconsistent or incompatible with the purposes for which the lands are managed, or with other uses; or (ii) [t]he proposed use would not be in the public interest . . . ."  36 C.F.R. §251.54(e)(5)(i),(ii).

163.  Consistent with these Forest Plan provisions and Forest Service regulations, the Forest Service Manual states: "Authorize use of National Forest lands . . . only if . . .[t]he proposed use cannot reasonably be accommodated off of National Forest System lands."  FSM 2703.2 (2)(b).

164.  Further, the Forest Service Manual requires: "Do not authorize the use of National Forest System lands solely because it affords the applicant a lower cost or less restrictive location."  FSM 2703.2 (3).

165.  In summary, a new pipeline corridor on the Caribou National Forest is not lawful unless all of the following conditions are met: (1) the new pipeline corridor is in the public interest; (2) the new pipeline corridor is compatible and consistent with other Forest resources in the area; (3) there is no reasonable alternative or accommodation off National Forest lands; (4) the agency has made an express determination that using existing right-of-ways

is "impractical," and (5) the rationale for locating the new pipeline corridor on National Forest lands is not solely lower cost or less restrictive location.

166.    In the Project EIS and SEIS, the Forest Service fails to demonstrate compliance with these requirements.

167.    (1) PUBLIC INTEREST. There is no analysis in the Project EIS of whether the new pipeline corridor is in the public interest.  As the EPA stated in its DEIS comments, "[t]here is no assessment of community impacts or risk from pipeline leakage, rupture, or explosion, nor of its proximity to schools, outdoor recreation areas, high population densities, or vulnerable and disadvantaged populations."  The Project EIS simply asserts that a pipeline is safer than delivery trucks but no meaningful analysis or supporting data is provided regarding the risk of a pipeline accident as compared to a trucking accident.  As one public comment notes: "The National Transportation Board has a website with 130 reports of pipeline incidents." Another serious public concern – what would happen if a wildfire burned through the area – was never seriously analyzed in the Project EIS.  In short, the installation of a permanent, private natural gas pipeline through public lands for the economic benefit of one private company is a private interest, not a public interest.  The public interest in this case is in conservation of Inventoried Roadless Areas, conservation of habitat for species listed under the ESA, including a key potential linkage corridor for lynx, and conservation of important sage grouse habitat for a population that is precipitously declining.  Therefore, the Project is not in the public interest.

168.    (2) COMPATIBLE & CONSISTENT.  There is no analysis in the Project EIS of whether the pipeline "would be inconsistent or incompatible with the purposes for which the lands are managed."  Courts that have reviewed similar language requiring that a use be "compatible" have held that the determination must be explicit.  *See e.g. Swan View Coal.,*

*Inc. v. Barbouletos,* 307 F. Appx 49, 51 (9th Cir. 2009); *All. for the Wild Rockies v. Bradford*, 720 F. Supp. 2d 1193, 1217–18 (D. Mont. 2010)("The EIS's, EA, and Biological Assessments do not explicitly address whether the projects are compatible the grizzly bear needs, as required by the Forest Plan.").  In this case, multiple years of construction and maintenance with heavy equipment, followed by annual motorized intrusions for surveys, and likely frequent illegal ATV use indefinitely, will displace imperiled wildlife that would otherwise use this area, including sage grouse, lynx, wolverines, and grizzly bears.  This impact is particularly significant because the entire area is designated as a potential linkage corridor for lynx.  Additionally, the area is critical deer and elk winter range, but the corridor will most certainly be used as a snowmobile trail in winter, which will displace deer and elk at the time they are most vulnerable.  Thus, a pipeline is not compatible with the needs of wildlife in the area.  The Forest Service's failure to address the compatibility requirement becomes even more egregious when considering the fact that the sage grouse population has declined by 25%, thereby reaching a hard trigger that mandates greater conservation measures.  In light of these extenuating circumstances, and the fact that the entire pipeline corridor is within 10 miles of sage grouse lek, the need for a compatibility analysis is even more pressing.

169. (3) NO REASONABLE ALTERNATIVE OFF NATIONAL FOREST.  The Project EIS fails to demonstrate that no other reasonable alternative exists to public land routing, or that the "need" for the project cannot be accommodated off the National Forest.  Moreover, as set forth at length above, there is a feasible alternative – the natural gas company could increase its storage and continue to use surface transportation.  Although this is not the preference of the company because it would cost them more money over time, "the costs for such a large amount of storage would be feasible . . . ."

30

170.   (4) EXISTING ROW "IMPRACTICAL."  The Forest Service failed to make an express finding that the use of existing right-of-ways is "impractical."  Indeed, there is no meaningful disclosure and analysis of this requirement at all in the Project EIS or SEIS. Instead, the SEIS incorrectly states that this requirement only applies to the BLM.

171.   (5) SOLELY COST OR RESTRICTIONS.  Finally, the Forest Service fails to acknowledge and address the mandate from its own Forest Service Manual, which states: "Do not authorize the use of National Forest System lands solely because it affords the applicant a lower cost or less restrictive location."  FSM 2703.2 (3).  The conclusory statements in the Project EIS and SEIS regarding why the Forest Service refused to analyze other alternatives indicate that "lower cost" and "less restrictive location" do indeed appear to be factors that were relied upon by the agency.

172.   For all of these reasons, the Project EIS violates the Forest Plan, Forest Service regulations, the Forest Service Manual, NEPA, NFMA, the Mineral Leasing Act, and the APA.

## FOURTH CLAIM FOR RELIEF

*The Forest Service's failure to rigorously explore and objectively evaluate all reasonable alternatives in the Project EIS violates NEPA and the APA.*

173.   All above paragraphs are incorporated by reference.

174.   In addition to the proposed agency action, every EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives" to that action. 40 C.F.R. § 1502.14(a).

175.   Agencies shall "include reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14(c).

176.   The analysis of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14.

177.  "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005).

178.  "Feasible alternatives should be considered in detail." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1052 (9th Cir. 2013).

179.  "[T]he touchstone for our inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *State of Cal. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982).

180.  "In the absence of an alternative that looks to already developed areas for future . . . use, the . . . decisional process ends its inquiry at the beginning." *State of Cal. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982).

181.  Similarly, if "the range of alternatives considered by the EIS omits the viable alternative of allocating less unspoiled area to development ... the EIS is inadequate, in violation of NEPA." *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 814 (9th Cir. 2005).

182.  The Ninth Circuit has rejected a Forest Service EIS when it "failed to consider an alternative that was more consistent with its basic policy objectives than the alternatives that were the subject of final consideration." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999).

183.  In *Muckleshoot*, the Ninth Circuit held that "the Forest Service failed to consider an adequate range of alternatives. The EIS considered only a no action alternative along with two virtually identical alternatives." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999).  The court held that the agency should have analyzed one of the alternatives that was eliminated from further study.  *Id.*

184.  Additionally, an agency "cannot ignore [a programmatic management goal] when it

determines the reasonable range of alternatives for NEPA review of site-specific actions." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1053 (9th Cir. 2013).

185.    As noted above, in this case, there are numerous governing land management goals, guidelines, standards, regulations, and statutes that cover the construction of new right-of-way corridors for natural gas pipelines, and they require the Forest Service to prioritize alternatives off National Forest or on existing right-of ways.  The agency "cannot ignore" these priorities when determining the range of alternatives.  *W. Watersheds Project*, 719 F.3d at 1053.  Instead of analyzing "virtually identical" alternatives that do not meet these priorities, the agency must analyze a reasonable range of alternatives "more consistent with its basic policy objectives."  *Muckleshoot*, 177 F.3d at 813.  Several alternatives could have been considered – increased storage, a pipeline route adjacent to Highway 89, and pipeline routes that follow existing right-of-ways and don't require entry into Inventoried Roadless Areas.  Plaintiffs were not the only concerned parties raising these alternatives; both the EPA and Idaho state agencies made similar recommendations.  The Project EIS does not state that any of these alternatives are impossible.  To the contrary, the Project EIS expressly states that the storage alternative is "feasible."  However, the Forest Service refused to analyze these feasible alternatives in detail in the Project EIS as required by NEPA.

186.    Furthermore, to the extent the Forest Service relies on the document "Environmental Constraints Analysis for Lower Valley Energy's Natural Gas Pipeline Alternatives (Stantec 2017a)," as its analysis of alternatives, such reliance is impermissible under NEPA.  The agency must provide to the public "the underlying environmental data" from which the Forest Service develops its opinions and arrives at its decisions. *See Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir.1998).  Although the agency

may incorporate publicly available data underlying the EIS by reference, a source may be incorporated by reference only if "it is reasonably available for inspection by potentially interested persons within the time allowed for comment." 40 C.F.R. § 1502.21. The Forest Service did not make this document publicly available within the time allowed for comment; therefore, the agency cannot rely on this document as a substitute for an analysis of reasonable alternatives in the Project EIS.

187.   For all of these reasons, the Forest Service's failure to consider all viable alternatives in detail in the Project EIS, particularly those that are more consistent with governing land management goals, guidelines, standards, regulations, and statutes, is a violation of NEPA and the APA.

## VIII.  RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the following relief:

A.   Declare that the Project violates the law;

B.   Either vacate the Project Decision or enjoin implementation of the Project;

C.   Award Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees under EAJA; and

D.   Grant Plaintiffs any such further relief as may be just, proper, and equitable.

DATED this 14th Day of April, 2025.

/s/Rebecca K. Smith
REBECCA K.  SMITH
Public Interest Defense Center, P.C.

Attorney for Plaintiffs