UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| YELLOWSTONE TO UINTAS CONNECTION, and ALLIANCE FOR THE WILD ROCKIES,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>MEL BOLLING, Forest Supervisor Caribou-Targhee National Forest; UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture,<br><br>　　　　Defendants, and<br><br>LOWER VALLEY ENERGY, INC.,<br><br>　　　　Intervenor. | Case No. 4:25-cv-00211-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Plaintiffs Yellowstone to Unitas Connection and Alliance for the Wild Rockies' (collectively "Alliance") Motion for Preliminary Injunction and/or Temporary Restraining Order. Dkt. 14. Defendants Bolling and the United States Forest Service (collectively, the "Forest Service") and Intervenor Lower Valley Energy ("LVE") oppose the Motion. Dkts. 19, 20. The Court held oral argument on July 10, 2025, and took the motion under advisement.

Upon review, and for the reasons set forth below, the Court DENIES Alliance's Motion for Preliminary Injunction and/or Temporary Restraining Order.

## II. BACKGROUND

On November 1, 2019, Defendant Bolling signed a Record of Decision authorizing the Crow Creek Pipeline Project ("Project") in the Caribou-Targhee National Forest. As part of that process, the Forest Service issued an Environmental Impact Statement ("EIS") assessing the impact of the Project on the physical environment. The purpose of the Project was to allow a private company—LVE—to bury a pipeline to facilitate the transportation of natural gas from Montpelier, Idaho, to Afton, Wyoming.

LVE is a member-owned natural gas and electric utility cooperative serving around 5,000 natural gas, and 31,000 electrical, members in western Wyoming and eastern Idaho. Through the Project, LVE hoped to increase the reliability and cost-efficiency of providing natural gas to its members in Wyoming, as it currently must transport roughly 150 truckloads of liquified natural gas to Afton each year for distribution. A buried pipeline would provide more reliable service and lower costs—among other benefits.[1]

On April 20, 2020, Plaintiffs filed a Complaint challenging the Project. The undersigned presided over that case. *Yellowstone to Uintas Connection v Bolling, et al.*, Case No. 4:20-cv-00192-DCN. Ultimately, the Forest Service withdrew its decision

---

[1] Alliance takes issue with the fact that the Project essentially benefits a private company. It avers that although the Forest Service implies LVE is the only supplier of heating fuel to Afton, such is not really the case. Propane is available to customers and this pipeline would likely cause current propane customers to switch to natural gas, which is a financial benefit for the natural gas company, but a financial loss for the propane company. While its argument is understandable, Alliance does not cite to any case or statute prohibiting the Forest Service from taking action that directly or indirectly benefits or disadvantages a private company.

MEMORANDUM DECISION AND ORDER – 2

authorizing the Project and the parties stipulated to the dismissal of that lawsuit.

After a period of re-evaluation, the Forest Service issued a draft supplemental EIS for the Project on July 14, 2023, and then a final supplemental EIS on July 19, 2024 ("SEIS").[2] The Forest Service issued a Record of Decision (the "2024 ROD") re-authorizing the Project on December 4, 2024, and issued a special use permit for the Project on March 20, 2025.

The proposed pipeline from Montpelier to Afton is 12 inches in diameter, 48 miles long, and crosses approximately 18.2 miles of the Caribou-Targhee National Forest. Where possible, the Project will follow existing roads or use existing rights-of-way. Elsewhere, vegetation will have to be removed to complete the digging, burial, and maintenance of the pipeline. The 2024 ROD approves a 50-foot-wide construction right-of-way (narrowed to 25-foot-wide in wetlands and aquatic zones) and a 20-foot-wide right-of-way for operation and maintenance of the pipeline on national forest lands. To accommodate the right-of-way, the Forest Service created a utility corridor under the Caribou National Forest Revised Forest Plan ("Forest Plan").[3]

On April 14, 2025, Plaintiffs filed this new lawsuit for judicial review under the

---

[2] Alliance asserts the only change to the Project between the original EIS and the SEIS was the rerouting of 0.5 miles of pipe off federal Bureau of Land Management ("BLM") lands onto private lands. The Forest Service did not respond to Alliance's contention or identify what other changes it made as part of the re-evaluation. However, the Forest Service does acknowledge the reason it withdrew its prior decision (and settled the prior lawsuit) was because the proposed route would have crossed BLM land and required additional permits and approvals under the MLA. The new route does not cross BLM land.

[3] As explained in more detail below, a "forest plan" is a comprehensive document that guides resource management activities in a national forest. In this case, the governing document is the 2003 Caribou Revised Forest Plan. Dkt. 14-12.

MEMORANDUM DECISION AND ORDER – 3

Administrative Procedures Act ("APA") challenging the 2024 ROD, the associated EISs, and, ultimately, the Project. Dkt. 1. Alliance alleges the Forest Service's decision was arbitrary and capricious and violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331 et seq., the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 et seq., and the Mineral Leasing Act ("MLA"), 30 U.S.C. §§ 185 et seq—all under the umbrella of the APA, 5 U.S.C. §§ 701 et seq. *See generally id*. at 24–33.

On May 21, 2025, LVE filed an unopposed Motion to Intervene as a party in this suit. Dkt. 6. The Court granted the Motion. Dkt. 7.[4]

On May 23, 2025, the Forest Service provided Alliance with 45-days' notice of its intent to begin "surface-disturbing activities" on forest land.

On June 16, 2025, Alliance filed the present Motion for Preliminary Injunction and/or Temporary Restraining Order seeking to temporarily halt any work on forest land until the underlying merits of this lawsuit are resolved. Dkt. 14.

Considering the mid-July start date of work on forest land, the Court sped up briefing on Alliance's Motion. Dkt. 16. The Forest Service filed a brief in opposition. Dkt. 19. LVE filed a short opposition (Dkt. 20) and joined the Forest Service's opposition as well (Dkt. 21). Alliance replied. Dkt. 25. The opposition briefs confirm work will begin on forest land on July 15, 2025. LVE also filed a Motion to Supplement (Dkt. 24) which the Court granted (Dkt. 26).[5]

---

[4] Of note, the Court allowed LVE to intervene in the prior suit. Case No. 4:20-cv-00192-DCN, Dkt. 14.

[5] Pursuant to the Court's previously issued notice, the parties recently submitted their joint litigation plan. Dkt. 22. That plan outlines when: (1) the administrative record will be submitted; (2) objections will be

MEMORANDUM DECISION AND ORDER – 4

The Court held a hearing on Alliance's Motion on July 10, 2025. The matter is ripe for review.

### III. LEGAL STANDARD

Injunctive relief "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4) that an injunction is in the public interest. *Id*. at 20. Where, as here, "the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

### IV. ANALYSIS

#### A. INTRODUCTION

Before addressing the *Winter* factors, a brief overview of the relevant legal standards for APA cases is helpful. The Court will not delve into these matters in depth at this time because it does not have the benefit of the administrative record[6] or summary judgment briefing. However, insofar as the current question is whether Alliance has made the requisite showing of a "likelihood of success" on any cause of action, the Court will analyze

---

lodged; and (3) summary judgment briefing will begin and end. At present, summary judgment briefing will be ripe on November 28, 2025. *Id*. at 4.

[6] The Administrative Record was recently lodged with the Court. Dkt. 23. The Court has not yet had an opportunity to review it. Nor has Alliance confirmed if the Administrative Record is accurate or needs supplementation. And, while the parties have submitted certain documents as part of the current motion practice which are, presumably, also part of the Administrative Record, the "Administrative Record" itself does not play a role in the Court's decision today.

Alliance's claims under the relevant statutory framework in a preliminary fashion.

   1. NEPA

Congress enacted NEPA, 42 U.S.C. §§ 4321-4370m-12, to establish a process for federal agencies to consider the environmental impacts of major federal actions. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,* 435 U.S. 519, 558 (1978). NEPA imposes procedural, rather than substantive, requirements on federal agencies, and it is "well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

As the Supreme Court recently noted, "NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decision-making, not to paralyze it." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1507 (2025). "When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry[.]" *Id*. at 1513. These choices must be upheld if "they fall within a broad zone of reasonableness." *Id*.

   2. NFMA

Under NFMA, the Forest Service manages Forest Service lands at the forest level and the individual project level. *See* 16 U.S.C. § 1604; *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998). At the forest level, the Forest Service develops a forest plan, which is a broad, long-term planning document for managing forest resources. 16 U.S.C. § 1604(g)(1), (3). At the project level, site-specific projects must be consistent with the applicable forest plan, or the forest plan must be amended. *Id*. § 1604(i).

"[T]he Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012); *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020).

3.  APA

A court's review of an agency's compliance with NEPA (and NFMA) is governed by the APA. *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) ("Because NFMA and NEPA do not provide a private cause of action to enforce their provisions, agency decisions allegedly violating NFMA and NEPA are reviewed under the [APA]." (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005)).

The Court's role, then, "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Under the APA, agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

"This standard is highly deferential, presuming that agency action to be valid." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011) (quoting *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007)); *see also River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010). The Court must "not substitute [its] judgment for that of the agency." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (cleaned up), *abrogated on other grounds by Winter v. Nat.*

*Res. Def. Council*, 555 U.S. 7 (2008). "The agency's action need only be a reasonable, not the best or most reasonable, decision." *River Runners*, 593 F.3d at 1067 (cleaned up).

## B. DISCUSSION

### 1. *Success on the Merits*

As just noted, the Court's review under the APA is fairly deferential. The Court's summary in another recent APA case is worth noting: "whether the Court would have done the review differently or reached different conclusions based upon the data is irrelevant. The question is whether the Forest Service committed a clear error in judgment . . . ." *Alliance for the Wild Rockies v. United States Forest Service, et. al.*, 2025 WL 1827090, at *13 (D. Idaho July 1, 2025) (cleaned up). Thus, the Forest Service's actions here must be upheld unless it committed a clear error. And, at this early stage when the Court is not formally deciding the merits-based questions, but only looking at the "likelihood" of Alliance's success, the inquiry is even more basic.

Alliance alleges it is likely to succeed on the merits in this case and, as a result, it is entitled to injunctive relief. At the very least, it alleges it has raised "series questions going to the merits" which should concern the Court and justifies a pause in construction until the underlying claims are briefed, argued, and decided.

Alliance focuses on three primary arguments in support of its contention that it will prevail on the merits of its APA claims.

a. <u>Sage Grouse</u>

First, Alliance argues the Forest Service did not properly evaluate the impact the Project will have on Sage Grouse. Specifically, Alliance argues the Forest Service violated

NEPA and NFMA by failing to address a standard from the Forest Plan. That standard—GRSG-GEN-ST-004—prohibits new authorizations or use permits in Sage Grouse protected habitat areas unless certain criteria are met.

Alliance spent a great deal of time—in briefing and at oral argument—discussing the plight of Sage Grouse. Specifically, it highlighted the decline in Sage Grouse population, how that decline eventually hit the "hard trigger"[7] metric in 2019, and how that change required heightened protections from the Forest Service as applied to different types of habitat area. While the Forest Service does not dispute this, it explains the reason it did not address GRSG-GEN-ST-004 in the EIS or SEIS was because the Project will not cross any of those types of protected habitat areas to begin with. In briefing and at oral argument, the Forest Service flatly stated the Project will not cross any land designated as Important Habitat Management Areas or Priority Habitat Management Areas.

Alliance flatly stated the Project will cross such lands. Or so it appears at first blush.

Whether by design or not, Alliance implies, but never outright states, that the Project will cross these habitat management areas. In briefing, Alliance explains these habitat areas exist in proximity to the Project's path and that the Forest Service needs to be proactive because of the declining population of Sage Grouse. Dkt. 25, at 9. While this may be accurate, suspiciously absent is any argument that the Project will *actually* cross either type of habitat management area which requires heightened protections. At oral argument,

---

[7] Various benchmarks or "triggers" were set to track the Sage Grouse population and its potential decline. When that benchmark was reached in 2019, it required that areas the Forest Service designated as "Important Habitat Management Areas" for Sage Grouse would need to be managed under the more stringent protections as utilized in "Priority Habitat Management Areas." Dkt. 14-4, at 13–14.

MEMORANDUM DECISION AND ORDER – 9

Alliance again reiterated these habitat areas require protection, but when the Court specifically asked if the pipeline would actually traverse any such areas, counsel responded that the pipeline would cross though these habitat areas on *state* lands and also that the pipeline would "impact" 674 acres of habitat on national forest land.[8] But it does not appear the Project will, in fact, cross any of the aforementioned habitat areas.[9] Thus, it is understandable why the Forest Service did not discuss GRSG-GEN-ST-004 in the EIS or SEIS because, simply put, it was not applicable. As a result, it can hardly be said the Forest Service "failed" to address this "binding" provision in violation of NEPA and NFMA. *See* Dkt. 14-1, at 17.

At this stage, it appears it will be difficult for Alliance to succeed on any claim based on this argument. This weighs against an injunction.

    b. <u>Utility Corridors</u>

Second, Alliance argues the 2024 ROD is inconsistent with the Forest Plan's directives on utility corridors because it would be feasible to route the Project pipeline *off* National Forest land or to use other existing corridors. There are three relevant provisions Alliance highlights.

First, the Forest Plan allows for new utility corridors only if the proponent can

---

[8] The official transcript from the hearing has not been ordered, therefore, the Court will not quote directly from it. But the Court can represent that its summary of counsel's comments above is accurate.

[9] To the extent this is a factual dispute—whether the Project crosses certain types of habitat area—such would not change the Court's decision today. At this stage, the Court is focused on the *Winter* factors; not on definitively resolving any factual (or legal) disputes. *See Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) ("In deciding a motion for a preliminary injunction, the district court is not bound to decide doubtful and difficult questions of law or disputed questions of fact." (cleaned up)).

MEMORANDUM DECISION AND ORDER – 10

"demonstrate that the proposal is in the public interest, and that no other reasonable alternative exists to public land routing." Dkt. 14-12, at 37. The Forest Service outlined how the Project served the public interest in the SEIS. Dkt. 14-5, at 11. It also addressed alternatives to creating a new utility corridor and why those alternatives were not feasible. *See* Dkt. 14-5, at 12, 22, 122–27.[10] The 2024 ROD likewise addressed these issues. Dkt. 14-6, at 58.

Second, the Forest Plan mandates that "where feasible, new facilities should be limited to existing rights-of-way . . . ." Dkt. 14-12, at 37. Again, the Forest Service considered this—in fact, 60% of the pipeline is within existing rights-of-way—and it also explained why certain deviations will be necessary and the actions it will take to minimize the environmental impact. Dkt. 14-6, at 59.

Third, the Forest Plan calls for the consolidation of routes to avoid parallel corridors. Dkt. 14-12, at 37. The 2024 ROD explains there are no parallel utility corridors at issue in the Project. Dkt. 14-6, at 59.

Thus, it will be difficult for Alliance to prevail with arguments that the Forest Service violated the Forest Plan regarding utility corridors when the Forest Service specifically evaluated and analyzed various alternatives to creating new corridors. Alliance may not agree with the Forest Service's decisions, but it cannot be said the Forest Service

---

[10] Notably, the original EIS identified four alternative actions the Forest Service could take and five alternative pipeline routes. Dkt. 14-8, at 41–54. Each alternative action and pipeline route was considered and rejected. In fact, it appears many of the alternatives would have caused *greater* environmental impacts. *See, e.g.,* Dkt. 14-8, at 49. Again, however, the Court need not analyze the wisdom of the Forest Service's alternatives and the *outcome*, but only whether it followed the correct *process.* Here, it is clear the Forest Service considered multiple alternatives.

MEMORANDUM DECISION AND ORDER – 11

failed to consider the issues. Based upon the record currently before the Court, it also cannot be said that the Forest Service acted unreasonably. *See River Runners*, 593 F.3d at 1067 ("The agency's action need only be a reasonable, not the best or most reasonable, decision."). This weighs against an injunction.

    c. The MLA

Third and relatedly, Alliance argues the Forest Service did not comply with the MLA because it never made the express finding that the use of existing rights-of-way for the pipeline was "impractical."

The MLA governs rights-of-way for pipelines across federal lands. 30 U.S.C. § 185 (q). The statute mandates: "In order to minimize adverse environmental impacts and the proliferation of separate rights-of-way across Federal lands, the utilization of rights-of-way in common shall be required to the extent practical . . . ." 30 U.S.C. § 185 (p).

As noted above, the Forest Service evaluated alternatives and, in fact, plans to use existing rights-of-way where possible. It also outlined why certain deviations from existing rights-of-way will be necessary. For these reasons, it contends it complied with the MLA's requirements. *See* Dkt. 14-6, at 9; Dkt. 14-5, at 20.[11]

Alliance's argument here is based on a case where the Fourth Circuit held the Forest

---

[11] In response to a public comment in the SEIS, the Forest Service stated the MLA did not apply because the pipeline did not cross any BLM land. Dkt. 14-5, at 170. However, in that same document, the Forest Service also maintained it complied with the MLA. *Id.* at 20. The Forest Service's position in the 2024 ROD (Dkt. 14-6, at 9), and now before the Court (Dkt. 19, at 20), continues to be that it complied with the MLA. At oral argument, the Forest Service explained the language from the SEIS—that the MLA did not apply—was a "relic" from the prior Project authorization. Alliance disagrees with that explanation. Regardless, the Forest Service reiterated that the MLA does apply in this situation and, furthermore, that it complied with all relevant MLA provisions.

MEMORANDUM DECISION AND ORDER – 12

Service had failed to comply with the MLA because it did not make an "express finding" that using existing rights-of-way was "impractical." Dkt. 25, at 5 (citing *Sierra Club, Inc. v. United States Forest Serv.*, 897 F.3d 582 (4th Cir. 2018)).

Alliance admits this case is not binding on the Court, but contends that, because the Fourth Circuit is the only circuit to address the issue, the Court should apply its logic in the present case. At the very least, Alliance contends the *Sierra Club* decision illustrates the issue is unresolved and the Court should enjoin the Forest Service until it can rule on the merits. The Court is not persuaded that it should give significant weight, if any, to the Fourth Circuit's decision.

To repeat, the *Sierra Club* decision is not binding on this Court. What value it has is, at most, persuasive. And the fact that it is the only court to address this issue does not automatically mean Alliance has raised serious questions on the merits to justify an injunction.[12]

More substantively, however, the Court is not inclined to impose a requirement on the Forest Service that: 1) came from an out-of-circuit case, and 2) isn't specifically outlined in the statute. The MLA provides that "utilization of rights-of-way in common shall be required to the extent practical." 30 U.S.C. § 185(p). But the MLA does not require (or imply) that the agency must make a strict finding of *impracticability* to satisfy this requirement.[13] As already outlined, the Forest Service reviewed existing rights-of-way and

---

[12] After all, it is possible no other court has addressed this issue because the regulation is straightforward, and the Fourth Circuit's interpretation is incorrect.

[13] This may seem like semantics, but the Court does not feel that imposing a burden of negativity is required to prove the Forest Service complied with the affirmative aspirations of the MLA. The regulation's metric

will be using some of those for the Project. Other routes were determined insufficient and others less practical. This was sufficient to satisfy the MLA's metrics.

The Court will not impose an additional statutory requirement on the Forest Service. Again, Alliance's success with this argument is suspect and does not support an injunction.

To summarize: Alliance has not shown a likelihood of success on the merits of its NEPA and NFMA causes of action. By all accounts, it appears the Forest Service complied with NEPA by considering reasonable and feasible alternatives and the impact its chosen alternative would have on the environment. The Forest Service also complied with NFMA because the 2024 DOR is consistent with the Forest Plan. In each instance where Alliance alleges the Forest Service was derelict in its statutory duties, the Court can only see disagreement. But disagreement is not enough. Alliance must show that the Forest Service's decision was arbitrary, capricious, or a violation of the law. On the current record, the Court cannot see how Alliance could prevail. Thus, an injunction is not warranted.

2. *Irreparable Harm*

While the first *Winter* factor is typically viewed as the most important element of a preliminary injunction inquiry which can end the Court's analysis if not met,[14] the issue of harm is also worth discussing in this case.

---

is "to the extent practical." *Id*. Something could be done "to the extent practical" without finding that every other conceivable alternative was completely *impractical*.

[14] *See, e.g.*, *Disney Enters., Inc. v. VidAngel, Inc.,* 869 F.3d 848, 856 (9th Cir. 2017) ("Likelihood of success on the merits is the most important *Winter* factor; if a movant fails to meet this threshold inquiry, the court need not consider the other factors . . . ." (cleaned up)); *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1058 (9th Cir. 2013) (affirming district court's denial of a preliminary injunction based only on review of the lack of a likelihood of success on the merits).

MEMORANDUM DECISION AND ORDER – 14

Alliance argues if the Project is allowed to proceed at this time, it will suffer the quintessential irreparable harm because trees cannot be put "back on the stumps" and the damage from the Project cannot be undone. Dkt. 14-1, at 24. While understandable, it appears the harms alleged are overblown or otherwise speculative. As for Alliance's specific concerns about mature trees, this is not a logging project. The pipeline will cross "limited timbered areas." Dkt. 14-5, at 167. In fact, at oral argument, the Forest Service explained it might not have to eliminate a single tree. The Project will primarily cross over lower vegetation such as sagebrush, which will be mowed during the implementation but then allowed to regrow. This reclamation would restore habitat and is thus not irreparable.

To be sure, some trees may have to be cut down. Other vegetation may not grow back in full force and some animals may be displaced despite the Forest Service's best efforts. But even if the Court found there was some irreparable environmental injury that would occur, that alone is not enough to justify a preliminary injunction. Alliance must satisfy all the preliminary injunction factors, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (even in a NEPA case "[a]n injunction should issue only if the traditional four-factor test is satisfied."), and the other factors may, as they do here, outweigh any alleged environmental harm. *McNair*, 537 F.3d at 1004.

Trees are a good example of the speculative nature of Alliance's perceived harms. The same could be said for Sage Grouse or any other potential negative effects from the Project. Alliance has alleged these harms *may* occur, but it has not quantified these harms to any degree or persuasively shown they will even come to pass. To be sure, it does not take an expert to conclude that *some* damage to the environment may occur as a result of

MEMORANDUM DECISION AND ORDER – 15

the Project. But the Forest Service has evaluated this and is taking steps to minimize any harm, allow for regeneration, and alleviate negative impacts.[15]

Alliance has not persuasively carried its burden that it will *likely* suffer any irreparable harm in the absence of an injunction. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (explaining that a plaintiff must "establish that irreparable harm is likely, not just possible").

   3. *Balance of Equities and Public Interest*

As explained, because the Government is a party in this suit, the last two *Winter* factors merge. *See Jewell*, 747 F.3d at 1092.

As is typically the case, neither party discussed either the balance of equities or the public interest (together or separately) in any amount of detail. Both simply argue their side prevails on the third and fourth prongs considering their success on the first two prongs.

For its part, the Forest Service and LVE allege the public is very interested in safe and affordable fuel. LVE filed its motion to supplement specifically to bring to the Court's attention two documents—one from the town of Afton, Wyoming, and one from the Board of Lincoln County Commissioners in Wyoming—outlining the local community's support for the Project. *See* Dkts. 24-2, 24-3. LVE also contends it would likely lose contracts and working crews if it is forced to halt the Project for another year, which would be unequitable for those laborers in the community.

---

[15] In briefing, Alliance argued the Forest Service had not presented any evidence that a few months of delay would cause any harm. Dkt. 25, at 12. During oral argument, Alliance also stated that LVE has not been able to show or quantify any economic harm it would suffer from a short delay. But as the party seeking an injunction, Alliance must demonstrate it will suffer irreparable harm in the absence of Court intervention, not that LVE (or the Forest Service) *will not* suffer any harm if the Court stops the Project.

In contrast, Alliance alleges (generally) that avoiding environmental harm and requiring statutory compliance is always in the public's interest.[16] True as that may be, Alliance does not point to any meaningful or targeted interests of its members that would be harmed absent an injunction.

As with the first and second *Winter* factors, the Court finds Alliance has not carried its burden as to the third and fourth factors as well.

## V. CONCLUSION

When considering the four *Winter* factors, the Court finds Alliance has not met its burden. The Court cannot find on the current record that Alliance has shown the Forest Service acted in an arbitrary and capricious manner or that its decision to approve the Project was clearly erroneous. For these reasons, the Court finds Alliance has failed to show an injunction is necessary at this time.

## VI. ORDER

1. Plaintiffs' Motion for Preliminary Injunction and/or Temporary Restraining Order (Dkt. 14) is **DENIED**.

DATED: July 14, 2025

David C. Nye
Chief U.S. District Court Judge

---

[16] Alliance's string-citation outlining the public's interest in preserving the environment and ensuring government compliance is accurate. Dkt. 14-1, at 25. Again, however, the Court would have appreciated more specific interests and equities.